IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TONY WILLIAMS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CORIZON, et al. | : | NO. 12-cv-02412 |

ORDER

AND NOW, this 9th day of September 2013, upon consideration of Defendants Corizon,

f/k/a PHS Correctional Healthcare, Inc. (Corizon), Rich Hallworth, Becky Pinney, Dennis Wade,

Dr. Luis Jose Boggio, and Dr. Mohammed Haque's (collectively, the "Corizon Defendants")

Motion for Summary Judgment (Doc. No. 133), Defendants City of Philadelphia, Dr. Bruce

Herdman, Prison Commissioner Louis Giorla, Deputy Commissioner Clyde Gainey, Warden

John Delaney, Warden Karen Bryant, Correctional Sergeant Anthony Cheeseborough, C/O J.

Lopez, C/O P. DeSalvo, and C/O Jamell Joyner's (collectively, the "Municipal Defendants")

Motion for Summary Judgment, Plaintiff's Responses thereto (Doc. Nos. 145 & 155), the

Municipal Defendants' Reply (Doc. No. 163), and Plaintiff's Sur Reply to the Municipal

Defendants' Reply (Doc. No. 166), and all exhibits filed with these motions and responses, it is

hereby ORDERED as follows:

1.  The Corizon Defendants' motion and the Municipal Defendants' motion are
    GRANTED as to all federal claims (Claims 1, 2, 3, 5, 6, 7, 8, 9, 11, 12, 22, and
    23).

2.  As no federal claims remain, this Court DECLINES to exercise supplemental
    jurisdiction over Plaintiff's state law claims (Claims 10, 13, 14, 15, 16, 17, 18, 19,
    20, 21, and 24). These claims are DISMISSED without prejudice, and Plaintiff
    may pursue these claims in state court, if desired.

3.  The Clerk of Court is directed to close this matter for statistical purposes.

I.      Factual and Procedural Background

        The core of Plaintiff's claims concerning denial of adequate medical care is an injury to

his left foot and leg and the resulting medical treatment he received for those injuries.[1] Plaintiff

also asserts claims resulting from allegations of specific applications of force by individual

correctional officers and a failure to properly handle his grievances. As we write only for the

parties, we state only those facts relevant to our conclusion.

        On May 4, 2010, while incarcerated in the Philadelphia Prison System (PPS) and housed

at the Alternative Special Detention (ASD) facility, Plaintiff twisted his left foot and broke his

leg when he tried to lower himself from the top bunk onto the foot locker for count and the

footlocker "came out from under [him]." (Pl.'s Dep. 13:10–13, 17:10–18:8, 19:8–9, Feb. 21,

2013, Doc. Nos. 139-3, 149-3, 155-3; Corizon Defs.' Statement of Facts ¶¶ 12, 27, Doc. No. 133;

Municipal Defs.' Statement of Facts ¶¶ 1, 12, 15–16, Doc. No. 143; Pl.'s Statement of Facts

¶¶ 138, 144, Doc. No. 145-1; Pl.'s Statement of Facts ¶¶ 231, 237, Doc. No. 155-1). Plaintiff

asserts that he was assigned a top bunk despite having bottom bunk status. (Pl.'s Dep. 16:15–18,

Feb. 21, 2013, Doc. Nos. 139-3, 149-3, 155-3; Municipal Defs.' Statement of Facts ¶ 13, Doc.

No. 143). Plaintiff was seen by a nurse within three minutes of his injury. (Pl.'s Dep. 20:12–15,

_____

        [1] Plaintiff also complains of carpal tunnel syndrome and pain to his right wrist; however,
the record indicates that he was seen by a doctor for this problem on March 9, 2010. (Pl.'s Dep.
72:17–21, Feb. 21, 2013, Doc. Nos. 149-3, 155-3). An x-ray was ordered and Plaintiff received
an Ace wrap or brace which he decided to wear "when [his] wrist bothered [him]," such as after
he played basketball. (Id. at 72:20–73:5, 74:22–75:11, 115:25–116:1). The x-ray demonstrates
"no evidence of fracture or dislocation or other osseus pathology." (Bustleton Radiology Report,
Mar. 11, 2010, Doc. No. 138). Plaintiff acknowledges having seen a doctor for his wrist pain "a
few times," including two dates in April 2010, and receiving a brace and medicine. (Pl.'s Dep.
77:8–21, Feb. 21, 2013, Doc. Nos. 149-3, 155-3).
        Plaintiff acknowledges receiving other medical care and medications, including for his
asthma and dental issues. (Id. at 110:20–111:13, 115:14–20, 117:16–21).

20:24–25, Feb. 21, 2013, Doc. Nos. 139-3, 149-3, 155-3; Municipal Defs.' Statement of Facts ¶ 17, Doc. No. 143; <u>accord</u> Inmate Injury Report, May 4, 2010, Doc. Nos. 138, 146-18, 156-24). Plaintiff was then transported by stretcher and seen by Defendant Dr. Luis Jose Boggio (Defendant Boggio) approximately an hour later. (Pl.'s Dep. 78:10–22, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; <u>accord</u> Municipal Defs.' Statement of Facts ¶¶ 18–19, Doc. No. 143). Plaintiff alleges that Defendant Boggio "grabbed [his] ankle, . . . proceeded to turn [his foot] clockwards[sic] and then counterclockwards[sic] while still holding onto [his] ankle," and also "stretch[ed] [his] knee back and forth" to gauge Plaintiff's reaction. (Pl.'s Dep. 79:20–80:7, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3). Plaintiff further alleges that Defendant Boggio tried to "get the [nurse] to make a bet with him that [Plaintiff's] leg wasn't broken" and said that he was going to send Plaintiff for x-rays. (Pl.'s Dep. 80:16–22, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3). Defendant Boggio has no recollection of such actions and has denied all material allegations relating to Plaintiff's claims. (Boggio Dep. 49:4–11, 51:7–16, Feb. 22, 2013, Doc. Nos. 133-11, 148-10, 155-5; <u>see</u> <u>generally</u> Def. Boggio's Answer, Doc. No. 59). Plaintiff was given Motrin and returned to his block that night. (Pl.'s Dep. 81:18–82:10, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; <u>accord</u> Municipal Defs.' Statement of Facts ¶ 20, Doc. No. 143).

On May 5, 2010, x-rays were taken indicating a "spiral fracture through the distal third of the shaft of the tibial with slight lateral displacement of the distal fracture fragment" and noting an "oblique fracture through the proximal shaft of the fibula," and Plaintiff was taken to Aria

Health, Torresdale[2] in the evening, where, after further x-rays, a splint was placed on Plaintiff's leg. (Pl.'s Dep. 82:20–84:24, 86:22–87:4, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; Bustleton Radiology Report, May 5, 2010, Doc. No. 138; see also Aria Health Records, Doc. Nos. 146-19, 156-25; accord Municipal Defs.' Statement of Facts ¶¶ 21–22, Doc. No. 143). Plaintiff also received crutches at the hospital, which he was able to use the next day. (Pl.'s Dep. 85:8–13, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; accord Municipal Defs.' Statement of Facts ¶ 23, Doc. No. 143). Plaintiff asserts that, after seeing the x-rays, a doctor at Aria Health said that "[he] should have immediate[] surgery." (Pl.'s Dep. 86:21, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3). The records from Aria Health indicate that Plaintiff was diagnosed with a "spiral fracture of the distal tibial shaft" with "minimal lateral and anterior displacement of the distal fragment" and "regional soft tissue swelling." (Aria Health Records, Doc. Nos. 146-19, 156-25).

In the early morning hours of May 6, 2010, Plaintiff was discharged with instructions to follow up with the "Prison Doctor" within 1-2 days.[3] (Aria Health Aftercare Instructions, Doc. Nos. 146-19, 146-20, 156-26; accord Haque Dep. 23:11–20, Apr. 11, 2013, Doc. Nos. 133-13, 146-12, 148-13, 155-8; Kalu Dep. 62:2–15, Apr. 9, 2013, Doc. Nos. 146-11, 154, 155-9). Plaintiff's medical records indicate that he was seen by a prison doctor the morning of May 6,

---

[2] This facility used to be known as "Frankford Hospital Torresdale." (Pl.'s Dep. 45:24–46:3, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3).

[3] There is a note in the medical records indicating that the doctor that discharged Plaintiff for return to the prison following the placement of a splint believed that the prison "ha[d] a orthopedic surgeon on site" with whom Plaintiff could follow up. (See Aria Health Records, Doc. Nos. 146-19, 156-25). However, the evidence in this case indicates that the prison does not have an orthopedist on site, but rather refers inmates for orthopedic care with Dr. Richard Mandel's practice group, see infra note 4.

2010, who recommended follow-up with an orthopedist[4] and ordered pain medication. (Progress

Notes, May 6, 2010, Doc. No. 138). Plaintiff appears to claim that a referral form completed by

Defendant Dr. Haque (Defendant Haque) for Plaintiff to see an orthopedist, marked "urgent,"

was not faxed for five days.[5] (See Haque Dep. 23:21–28:19, Apr. 11, 2013, Doc. Nos. 133-13,

146-12, 148-13, 155-8). That same day, Plaintiff was issued an indefinite bottom bunk

accommodations slip with a note for a double mattress. (Bottom Bunk Slip, May 6, 2010, Doc.

Nos. 138, 157-15). On May 10, 2010, Plaintiff saw a doctor who prescribed Vicodin, which

---

[4] ASD and PPS did not have an orthopedist on staff at the time of Plaintiff's injury. (Haque Dep. 29:8–16, Apr. 11, 2013, Doc. Nos. 146-12, 148-13, 155-8; accord Boggio Dep. 112:12–18, Feb. 22, 2013, Doc. Nos. 148-10, 155-5). There was, however, a process by which inmates could be referred to an orthopedist to receive specialized follow-up care, namely: (1) a physician "write[s] the orders" and "fill[s] out the referral," (2) the referral is sent by fax to Dr. Kalu as a supervisor for approval, (3) someone in Dr. Kalu's office schedules the visit, (4) a list is generated and given to transportation, and (5) transportation "make[s] arrangements to take [the inmates]" to their visit. (Kalu Dep. 70:9–15, Apr. 9, 2013, Doc. Nos. 146-11, 154, 155-9; Haque Dep. 23:21–28:14, 61:11–15, Apr. 11, 2013, Doc. Nos. 146-12, 148-13, 155-8; Boggio Dep. 60:20–24, Feb. 22, 2013, Doc. Nos. 148-10, 155-5). This process is consistent with Plaintiff's allegations concerning his visits with orthopedists for care.

[5] Plaintiff has not submitted the actual signed referral form, so the exact timing is unclear. At Defendant Haque's deposition, Plaintiff's attorney discusses faxes between ASD and Dr. Kalu's office, but has dates of May 10, 2010, May 11, 2010, and May 16, 2010, as well as references to May 6, 2010, and at two different points suggests both that (1) Dr. Kalu's office transmitted a fax on May 11, 2010, with a date at the bottom of May 10, 2010, but references that the document "wait[ed] five days before being faxed," and (2) the date on the document with Dr. Kalu's signature was dated May 16, 2010. (See generally Haque Dep. 23:21–28:19, Apr. 11, 2013, Doc. Nos. 133-13, 146-12, 148-13, 155-8).
    Plaintiff also appears to allege that other referral forms for Plaintiff to see the orthopedist were lost. However, aside from two other incidents in June where Plaintiff's referral forms were not faxed promptly, see infra, the only evidence offered is Defendant Boggio's testimony, in which he admitted only that he "had . . . been informed that other referral forms had been lost or misplaced" and estimated that there had been "maybe four" instances in the past four years where a request did not go to Dr. Kalu's office and an appointment was not made. (Boggio Dep. 95:8–96:4, Feb. 22, 2013, Doc. Nos. 148-10, 155-5). This Court notes that the past four years includes a time period beyond Plaintiff's allegations.

Plaintiff received. (Pl.'s Dep. 87:5–88:4, 90:2–3, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3). On May 11, 2010, Plaintiff was again seen by a prison doctor due to complaints of swelling of his leg and "purple discoloration," and the doctor noted that he was "await[ing] ortho." (Progress Notes, May 11, 2010, Doc. No. 138; accord Municipal Defs.' Statement of Facts ¶ 25, Doc. No. 143).

On May 12, 2010, Plaintiff was admitted to the infirmary at the Detention Center for a few weeks, where he was assigned his own room. (Pl.'s Dep. 89:8–21, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; see also Infirmary Nursing Admission, May 12, 2010, Doc. No. 138; accord Municipal Defs.' Statement of Facts ¶ 26, Doc. No. 143). Plaintiff asserts that he did not see a doctor in the infirmary, except for the last day, when Defendant Boggio entered Plaintiff's room to have a conversation with him and a "female doctor" permitted him to leave the infirmary after complaining that he had not seen a doctor because he did not want to be seen by Defendant Boggio and was told he was the only doctor on site; however, Plaintiff did see nurses during this time. (Pl.'s Dep. 90:6–92:8, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; accord Municipal Defs.' Statement of Facts ¶ 27, Doc. No. 143).

On May 18, 2010, two guards[6] were late picking up Plaintiff for transport to Dr. Richard Mandel's[7] office, and Plaintiff was, therefore, seen by Dr. Mandel the next day, May 19, 2010. (Pl.'s Dep. 21:18–22:2, Feb. 21, 2013, Doc. Nos. 139-3, 149-3, 155-3; Corizon Defs.' Statement

---

[6] Plaintiff's amended complaint identifies this individuals only as "ASD Transport Unit 'JOHN DOES'"; however, Plaintiff's amended complaint was later amended to name these individuals as "Correctional Officer P. DeSalvo" and "Correctional Officer J. Lopez." (Order, Jan. 25, 2013, Doc. No. 112).

[7] Dr. Richard Mandel was originally named as a defendant in this matter, but all claims against him have since been dismissed. (See Order, Oct. 25, 2012, Doc. No. 78).

of Facts ¶¶ 47–48, Doc. No. 133; Municipal Defs.' Statement of Facts ¶ 28, Doc. No. 143; Pl.'s

Statement of Facts ¶ 187, Doc. No. 145-1; Pl.'s Statement of Facts ¶ 280, Doc. No. 155-1). There

is evidence that suggests that the guards were late because the wheelchair van was not working.

(Email from Logan to Marsella, Doc. No. 156-27; Kalu Dep. 65:3–7, Apr. 9, 2013, Doc. Nos.

146-11, 154, 155-9). Plaintiff claims that, during transport, one of the guards said that, "if [he]

r[a]n, [the guard] ain't got any problem putting [a] bullet in [Plaintiff's] a**." (Pl.'s Dep.

23:12–17, Feb. 21, 2013, Doc. Nos. 139-3, 149-3, 155-3).

On May 21, 2010, Dr. Mandel performed surgery on Plaintiff at Mercy Suburban

Hospital to repair his leg. (Corizon Defs.' Statement of Facts ¶ 49, Doc. No. 133; Municipal

Defs.' Statement of Facts ¶ 29, Doc. No. 143; Pl.'s Statement of Facts ¶ 190, Doc. No. 145-1;

Pl.'s Statement of Facts ¶ 283, Doc. No. 155-1). The next day, upon release from the hospital,

Plaintiff returned to prison with his "left leg in a splint cast with Ace wrap." (Pl.'s Dep.

95:24–96:2, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3). Plaintiff was ordered to keep

his leg elevated but alleges he received only "two thin pillows" and claims he was told not to

walk on his leg at all. (Pl.'s Dep. 97:4–17, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3).

Plaintiff's discharge instructions from Mercy Suburban Hospital direct Plaintiff that his leg is

non-weight bearing and should be elevated and also recommend that he call his doctor's office

for a follow-up appointment in two weeks. (Mercy Suburban Hospital Discharge Instructions,

Doc. Nos. 146-21, 157-2). Notes consistent with these instructions were entered into Plaintiff's

medical records; however, one includes the additional note that "nurses [are] not to change

dressing until [patient] is seen by ortho." (See Progress Notes, May 22, 2010, Doc. No. 138).

Plaintiff's medical records indicate that he was seen by medical staff on May 25, 2010, May 26,

2010, May 28, 2010, and May 29, 2010. (See Progress Notes, May 25, 2010, May 26, 2010, May 28, 2010, May 29, 2010, Doc. No. 138). Plaintiff asserts that, despite a note dated May 29, 2010, in his record, he did not try to walk around with crutches for a while after his surgery. (Pl.'s Dep. 97:20–98:13, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3). On May 31, 2010, Plaintiff was seen by Dr. Winters and issued a bottom bunk accommodations slip with an end date of July 31, 2010. (Progress Note, May 31, 2010, Doc. No. 138; Bottom Bunk Slip, May 31, 2010, Doc. Nos. 138, 157-25). On June 1, 2010, having noticed that Dr. Winters' referral for orthopedic follow-up for Plaintiff had not yet been faxed, Defendant Dr. Mohammed Haque (Defendant Haque) completed a new referral form that was faxed to and approved by Dr. Kalu on June 2, 2010. (Corizon Defs.' Statement of Facts ¶ 134, Doc. No. 133).

On June 9, 2010, Plaintiff had a follow-up appointment with the orthopedist in which the sutures were removed and a short leg cast was applied. (PPS Form, June 9, 2010, Doc. Nos. 146-24, 147-2, 157-5; accord Municipal Defs.' Statement of Facts ¶ 30, Doc. No. 143; Corizon Defs.' Statement of Facts ¶ 135, Doc. No. 133; Haque Dep. 36:12–20, Apr. 11, 2013, Doc. Nos. 133-13, 146-12, 148-13, 155-8). The orthopedist also recommended follow-up in six weeks for a new x-ray and "possible cast removal." (Id.; accord Chart Note,[8] June 9, 2010, Doc. No. 147-2). Plaintiff's medical records indicate that, although a referral form for an orthopedist was filled out on June 9, 2010, it "still [had] not [been] faxed to [Dr. Kalu's office]" as of June 30, 2010, and another orthopedic referral was done on that date. (Progress Note, June 30, 2010, Doc. No. 130; Corizon Defs.' Statement of Facts ¶ 136, Doc. No. 133; Haque Dep. 39:15–41:2, Apr. 11, 2013,

---

[8] This Chart Note has a signature line for Dr. Mandel, but is not signed. However, it does appear to have been faxed from Dr. Mandel's practice, the Center of Advanced Orthopedics.

Doc. Nos. 133-13, 146-12, 148-13, 155-8). This second orthopedic referral form was faxed to and approved by Dr. Kalu on July 1, 2010. (Corizon Defs.' Statement of Facts ¶ 136, Doc. No. 133). Plaintiff was given an appointment with the orthopedist on July 22, 2010. (Haque Dep. 41:3–9, Apr. 11, 2013, Doc. Nos. 133-13, 146-12, 148-13, 155-8).

Plaintiff alleges that, on July 4, 2010, while housed at ASD, he went to Defendant Sgt. Cheeseborough (Defendant Cheeseborough) to tell him that he had witnessed Officer Bullock "grab[] [another inmate] by his neck" and "choke[]" that inmate during count, which had almost caused a "little riot." (See generally Pl.'s Dep. 23:24–26:1, 29:20–22, Feb. 21, 2013, Doc. Nos. 139-3, 149-3, 155-3). Defendant Cheeseborough "cut [Plaintiff] off" and, although Defendant Cheeseborough said that he was "going to respond to it," Plaintiff asked to go further up the process and speak to a lieutenant" as block alternate. (See id. at 26:20–27:6). At that point, Plaintiff claims that Defendant Cheeseborough "grabbed [him] by the back of [his] neck and forced [him] to walk out" despite the fact that he had recently had surgery and was not supposed to be putting weight on his leg. (Id. at 27:12–16, 31:11–14). When Defendant Cheeseborough "dragged [him] out," Plaintiff "tried to grab onto two doorways," to which Defendant Cheeseborough responded by "bang[ing] [Plaintiff's] hands down" and "push[ing] [him] through." (Id. at 27:17–25, 33:15–34:23). Defendant Cheeseborough has no recollection of these events and has denied all material allegations relating to Plaintiff's claims. (See generally Cheeseborough Dep., Mar. 1, 2013, Doc. Nos. 148-16, 155-13; Municipal Defs.' Answer, Doc. No. 54). Plaintiff claims that he was then told by a lieutenant that he could either file a grievance and be sent to "the hole" or "go back to [his] bed and let bygones be bygones." (Id. at 28:4–6). Plaintiff was placed in "the hole" for approximately a week, reportedly for "inciting a riot." (Id.

at 36:15–25). Municipal Defendants claim that Plaintiff was placed in segregation[9] from July 5, 2010, through July 15, 2010, due to Officer's Bullocks' charge of a major disciplinary infraction, of which he was found guilty on July 15, 2010, pointing to Plaintiff's movement summary and special management summary, which are consistent with this assertion. (Municipal Defs.' Statement of Facts ¶¶ 58–59, Doc. No. 143; Movement Summary 3, Doc. No. 139-1; Special Management Summary 1–2, Doc. No. 139-6). During his detention, Plaintiff acknowledged seeing a doctor in response to a sick call. (Pl.'s Dep. 102:2–16, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; accord Corizon Defs.' Statement of Facts ¶ 60, Doc. No. 133). Plaintiff's medical records indicate he was seen by medical staff in the early morning hours of July 5, 2010, and again on July 6, 2010. (Progress Notes, July 5, 2010, July 6, 2010, Doc. No. 138).

Plaintiff alleges that, in relation to this incident, he was told that "PPS's Internal Affairs was investigating the matter," but that he never learned of any outcome of such an investigation. (Am. Compl. ¶ 174, Doc. No. 14). Plaintiff alleges that "his grievances were thrown in the trash or not processed by Defendant, Giorla [the Commissioner of PPS] and other decision and policy-makers at PPS pursuant to a custom, policy and practice of unlawfully covering up violent acts of misconduct by correctional officers," including Defendant Cheeseborough. (Id. at ¶¶ 176–77). Plaintiff further asserts that Defendants City of Philadelphia and Lt. William Hilty[10] "failed to properly investigate and process [his] grievances." (Id. at ¶ 335).

---

[9] This is alternatively referred to as "MOD3" or "the hole."

[10] Plaintiff's amended complaint identified this individual as "Commanding Officer, Internal Affairs Unit"; however, Plaintiff's amended complaint was later amended to name this individual as "Lt. William Hilty." (Order, Jan. 25, 2013, Doc. No. 112). Lt. William Hilty was, therefore, originally named as a defendant in this matter, but all claims against him have since been dismissed. (See Order, June 7, 2013, Doc. No. 132).

X-rays of Plaintiff's leg were also taken on July 8, 2010, and August 5, 2010, which indicated two nondisplaced fractures; although Plaintiff did not recall the exact dates, he acknowledged receiving x-rays "around th[o]se times." (Pl.'s Dep. 114:5–14, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; Bustleton Radiology Reports, July 8, 2010, Aug. 5, 2010, Doc. No. 138). Plaintiff reportedly placed multiple sick call requests due to swelling in his leg, and appears to have been seen at least once in response to these requests. (Sick Call Request, July 29, 2010, Doc. Nos. 147-5, 157-10). It appears that the general policy with respect to sick call requests is that the inmate should be seen "face-to-face" within five days by a "qualified health care practitioner" and then, based on that practitioner's evaluation, the request may be "escalated to a mid-level to a physician." (Kalu Dep. 53:11–24, Apr. 9, 2013, Doc. Nos. 146-11, 154, 155-9). Plaintiff's medical records indicate that he was seen by medical staff for asthma treatment, which included notes for orthopedic follow-up, on July 9, 2010, July 21, 2010, and July 30, 2010. (Progress Notes, July 9, 2010, July 21, 2010, July 30, 2010, Doc. Nos. 138, 147-6, 147-7, 147-8, 147-13, 156-19, 157-12, 157-13, 157-18). Although Plaintiff was taken to the orthopedist for his appointment on July 22, 2010, it does not appear that Plaintiff was seen on that date. (Haque Dep. 41:3–9, 69:1–7, 73:3–17, Doc. Nos. 133-13, 146-12, 148-13, 155-8). Having not been seen on July 22, 2010, Defendant Haque indicated that Plaintiff would have been seen two weeks later, since the orthopedists come every two weeks. (Haque Dep. 73:18–74:15, Apr. 11, 2013, Doc. Nos. 133-13, 146-12, 148-13, 155-8; see also Boggio Dep. 60:22–24 (noting that the orthopedist "usually" came "every two weeks")).

On August 2, 2010, a referral form was completed by Defendant Boggio that requested "Followup ASAP This Week" regarding removal of Plaintiff's cast. (Referral Form, Aug. 2,

2010, Doc. Nos. 147-13, 157-18). On August 6, 2010, Plaintiff was seen by Dr. McHugh, an

orthopedist and partner of Dr. Mandel, to have his cast removed. (Pl.'s Dep. 104:5–20, Feb. 21,

2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; Corizon Defs.' Statement of Facts ¶ 67, Doc. No.

133; accord Municipal Defs.' Statement of Facts ¶ 34, Doc. No. 143; Haque Dep. 52:15–17, Apr.

11, 2013, Doc. Nos. 146-12, 148-13, 155-8). Plaintiff asserts that his cast was supposed come off

"16 days before that." (Id. at 104:20–21). Plaintiff claims that Dr. McHugh removed the cast, told

Plaintiff that "[his] bone wasn't healing at all," said he would discuss further treatment with Dr.

Mandel, and recommended that Plaintiff see Dr. Mandel. (Id. at 104:23–105:3; accord Dr.

McHugh Chart Note, Aug. 6, 2010, Doc. Nos. 146-22, 146-25, 157-3, 157-6; Progress Note,

Aug, 6, 2010, Doc. No. 138). Plaintiff was also told by a "foreign," female doctor at the prison

that he "would not be receiving a bone stimulator because that has to be plugged into a wall [and]

there's no sockets in [the correctional facility]" and that she did not know why he was told that

he would receive one.[11] (Id. at 107:6–13). Plaintiff acknowledges that he was repeatedly seen by

nurses, but claims that the nurses told him there was nothing they could do and that, although he

requested only to be seen by doctors, he did not see doctors except on the specific occasions

identified. (Id. at 110:3–11; see also Sick Call Request, Aug. 23, 2010, Doc. Nos. 147-11, 157-16

(with nurse's signature); General Sick Call, Aug. 23, 2010, Doc. No. 138). On August 18, 2010,

---

[11] It is unclear who told Plaintiff that he would get a bone stimulator. Although Dr. McHugh indicated in a Chart Note that he would recommend a bone stimulator and CAM boot, Dr. McHugh indicated in that same note that the case was to be discussed with Dr. Mandel and that follow-up should also be with Dr. Mandel. (See Dr. McHugh Chart Note, Aug. 6, 2010, Doc. Nos. 146-22, 146-25, 157-3, 157-6; accord Progress Note, Aug. 6, 2010, Doc. No. 138). There is no evidence in the record that indicates that Dr. Mandel adopted Dr. McHugh's recommendation or made a similar recommendation. Defendant Haque indicated that, having been seen by an orthopedist, the orthopedist, not the prison doctor, would determine the appropriate course of treatment. (Haque Dep. 55:20–56:3, Apr. 11, 2013, Doc. Nos. 133-13, 146-12, 148-13, 155-8).

Plaintiff was given an indefinite bottom bunk accommodations slip. (Bottom Bunk Slip, Aug. 18, 2010, Doc. Nos. 157-25, Doc. No. 138).

Plaintiff alleges that, on August 26, 2010, he went to the medical unit without a pass, complaining that he had put in multiple sick call requests and had not yet seen a doctor. (Inmate Grievance Form, Aug. 26, 2010, Doc. No. 139-7; see also Am. Compl. ¶ 179, Doc. No. 14). Plaintiff claims that, after seeing his injuries, an officer[12] told him she would call a "white shirt" and, while waiting for the "white shirt," Plaintiff was approached by the nurse who told him to wait to be called down to medical and indicated he should leave. (Inmate Grievance Form, Aug. 26, 2010, Doc. No. 139-7; see also Municipal Defs.' Statement of Facts ¶¶ 62–63, Doc. No. 143). Plaintiff further alleges that, when Plaintiff indicated he would not leave before seeing the "white shirt," the nurse complained to Defendant Jamell Joyner[13] (Defendant Joyner), who told him to "change [his] tone of voice" and then "grabbed" Plaintiff "by [his] shirt," during which he stepped on his foot, and "forced [him] towards the door."(Inmate Grievance Form, Aug. 26, 2010, Doc. No. 139-7; see also Municipal Defs.' Statement of Facts ¶¶ 64–68, Doc. No. 143). Plaintiff also claims that Defendant Joyner ignored his requests for his crutches and did not offer

---

[12] Plaintiff's grievance is not entirely clear as to who said they would get the "white shirt." In their statement of undisputed facts, the Municipal Defendants suggest this was a nurse, although not the same nurse who then called Defendant Jamell Joyner (Defendant Joyner).

[13] Plaintiff's amended complaint originally identified this individual as "Correctional Officer 'John Doe #1'"; however, Plaintiff's amended complaint was later amended to name this individual as "Jamell Joyner." (Order, Jan. 25, 2013, Doc. No. 112). Municipal Defendants suggest that Defendant Joyner was not one of the correctional officers working in the Medical Department on August 26, 2010; however, the rosters they provided only give information as to August 25, 2010. (See Curran-Fromhold Correctional Facility (CFCF) Roster, Doc. No. 139-8). Defendant Joyner did, however, state that he is a "receiving officer" and, therefore, would not have worked at the desk in medical intake. (Joyner Dep. 14:22–15:11, Mar. 27, 2013, Doc. No. 155-17).

or call for medical assistance. (Inmate Grievance Form, Aug. 26, 2010, Doc. No. 139-7; <u>see</u> <u>also</u> Municipal Defs.' Statement of Facts ¶ 69, Doc. No. 143; Am. Compl. ¶ 181, Doc. No. 14). Plaintiff's medical records indicate that he "had to be forcibly removed from the [medical] area" on this date. (Medical Records, Aug. 26, 2010, Doc. No. 138). Defendant Joyner has no recollection of this incident. (<u>See</u> Joyner Dep. 15:13–16:4, Mar. 27, 2013, Doc. No. 155-17). Plaintiff was seen by medical staff in Chronic Care on August 27, 2010, who included notes concerning recommendations for follow up with Dr. Mandel. (Medical Records, Aug. 27, 2010, Doc. Nos. 138, 147-9, 156-13, 156-14, 157-14, 158-17).

Upon Plaintiff's release from prison on September 9, 2010, Plaintiff was "referred to the ER or an orthopedic specialist regarding [his] leg" and went to the University of Pennsylvania the next day for medical care. (Pl.'s Dep. 113:5–14, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; Pl.'s Medical Records 2, Doc. Nos. 147-16, 157-22; Discharge Summary, Aug. 9, 2010, Doc. No. 138, 147-15, 157-21; Municipal Defs.' Statement of Facts ¶¶ 9, 36, Doc. No. 143). The attending physician's notes indicate that Plaintiff was to follow up with the orthopedists who saw him while in prison and continue to use crutches. (Pl.'s Medical Records 3, Doc. Nos. 147-16, 157-22). Plaintiff subsequently sought treatment with Pain Management Group in September 2010 and October 2010, as well as March 2011 and April 2011, but did not go from December 2010[14] through February 2011 because he did not have insurance. (Pl.'s Dep. 148:3–149:12, Feb. 21, 2013, Doc. Nos. 149-3, 155-3; Pain Management Records 2–5, Doc. Nos. 147-17, 148-4, 157-23, 158-13). In September 2010, Plaintiff was referred for an orthopedic

---

[14] It is not clear from the record whether Plaintiff sought treatment at Pain Management in November 2010.

evaluation and recommendations, (Pain Management Records 3, Doc. Nos. 147-17, 157-23);

however, it is unclear if Plaintiff ever received that evaluation. Plaintiff did not seek treatment

with Pain Management Group from May 2011 through September 2011. (Pl.'s Dep. 149:16–20,

Feb. 21, 2013, Doc. Nos. 149-3, 155-3). In correspondence with Plaintiff's previous attorney

dated September 20, 2011, Dr. Raymond G. Wisdo, D.C., of Pain Management opined that, "to a

degree of chiropractic certainty," the fractures of Plaintiff's tibia and fibula "created a general

weakening of the structural and soft tissue components of the area" that was permanent and

"typically results in a loss of optimum function" and that all of these injuries resulted from the

incident on May 4, 2010. (Pain Management Records 6–8, Doc. Nos. 147-17, 157-23). On

September 29, 2011, Plaintiff sought treatment at Mercy Health System, complaining of left leg

pain and was directed to get x-rays of his foot, ankle, knee, and hips and referred to an

orthopedist. (Mercy Health System Record, Doc. Nos. 148-5, 158-14).

     In October 2011, Plaintiff was arrested for violating probation and incarcerated in PPS

until January 2012. (Pl.'s Dep. 41:4–12, Feb. 21, 2013, Doc. Nos. 133-5, 149-3, 155-3;

Movement Summary 1, Doc. No. 139-1; Municipal Defs.' Statement of Facts ¶¶ 10, 37, Doc. No.

143). It does not appear that Plaintiff completed the recommended followup from Mercy Health

System prior to his arrest and incarceration. Plaintiff asserts that he entered prison with a "cane,

ankle brace[,] and knee brace, which were taken" from him.[15] (Am. Compl. ¶ 190, Doc. No. 14).

     Plaintiff admits receiving a bottom bunk accommodation form on October 13, 2011.

(Pl.'s Dep. 129:16–19, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; accord Physician's

---

[15] Although Plaintiff alleges that these items were "never replaced," (Am. Compl. ¶ 190, Doc. No. 14), he admitted in his deposition that he later received a wooden cane and plain knee brace.

Orders, Oct. 13, 2011, Doc. No. 138; Bottom Bunk Slip, Oct. 13, 2011, Doc. No. 138).

Notwithstanding the bottom bunk accommodation form, Plaintiff submitted a sick call and grievance on October 14, 2011, indicating that he was placed on the top bunk. (Inmate Grievance, Oct. 14, 2011, Doc. Nos. 147-22, 157-29; Sick Call Request, Oct. 14, 2011, Doc. Nos. 138, 147-18). Plaintiff further alleged that, on the night before, he had needed to "jump off the . . . top [b]unk," thought he had "re-injured [his] leg," and that, having gone to medical, they had diagnosed it as an "ankle sprain," given him crutches, and said they would take x-rays. (Id.). The record indicates that Plaintiff was seen by medical staff on October 13, 2011, and October 14, 2011, in response to complaints of leg pain. (Progress Notes, Oct. 13, 2011, Oct. 14, 2011, Doc. No. 138). Plaintiff was prescribed Motrin for his pain and given crutches by a doctor on October 14, 2011. (Physician's Orders, Oct. 14, 2011, Doc. No. 138). Plaintiff received wooden crutches on October 14, 2011, which he used for approximately three weeks; afterwards, he received a wooden cane. (Pl.'s Dep. 128:19–129:8, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; accord Receipt of Medical Equipment, Oct. 14, 2011, Doc. No. 138). Plaintiff submitted another grievance form on October 15, 2011. (Inmate Grievance, Oct. 15, 2011, Doc. Nos. 147-22, 157-29). Plaintiff admits receiving an x-ray of his left ankle on October 16, 2011. (Pl.'s Dep. 129:22–130:1, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; accord Prison Health Services X-Ray Report, Oct. 16, 2011, Doc. No. 138). The x-ray revealed a "[h]ealing or healed fracture." (Bustleton Radiology Report, Oct. 16, 2011, Doc. No. 138). An investigation regarding a grievance filed by Plaintiff determined that Plaintiff was seen by a doctor on October 17, 2011, who ordered a bottom bunk and crutches, and directed to maintain "[w]eight bearing precautions" until October 26, 2011, pending reevaluation by Defendant Corizon at that time.

(Finding of Inmate Grievance, Oct. 17, 2011, Doc. No. 147-23, 157-30; accord Physician's

Orders, Oct. 17, 2011, Oct. 19, 2011, Doc. No. 138). Plaintiff submitted a sick call request on

October 21, 2011, to both the Mental Health and Medical Departments complaining of problems

sleeping due to leg pains. (Sick Call Request, Oct. 21, 2011, Doc. Nos. 138, 147-19, 157-26).

The Mental Health Department appears to have responded that they do not prescribe sleep

medication, but there is no response noted in the record from the Medical Department. (Sick Call

Request, Oct. 21, 2011, Doc. No. 138[16]). There is some evidence disputing whether this slip was

actually a "medical" request or simply a "mental health" request. (Kalu Dep. 58:6–59:4, Apr. 9,

2013, Doc. Nos. 146-11, 154, 155-9). It appears Plaintiff submitted four more grievances in

October 2011. (See generally Inmate Grievances, Doc. Nos. 147-22, 157-29, 158-12).

The medical records indicate that Plaintiff was seen by a prison doctor on October 26,

2011, in response to complaints of leg pain. (Progress Notes, Oct. 26, 2011, Doc. No. 138).

Plaintiff acknowledges being seen by a male nurse practitioner around October 27, 2011, in

response to a complaint of "bl[ue] and green" bruises on his left leg, (Pl.'s Dep. 123:22–124:16,

Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3), and receiving Motrin for his pain,

(Physician's Orders, Oct. 27, 2011, Doc. No. 138). Plaintiff also acknowledges seeing a nurse

and nurse practitioner around November 2011 and receiving a "plain knee brace" or "knee

sleeve" with "regular Velcro."[17] (Id. at 124:19–125:20, 128:9–15; accord Medical Records, Nov.

---

[16] This Court notes that, although this same request was submitted as two other exhibits by Plaintiff, (see Doc. Nos. 147-19, 157-26), those exhibits do not have any writing in the "For Medical Use Only" section at the bottom.

[17] The medical records also indicate that Plaintiff was seen by a nurse practitioner regarding complaints of "chest discomfort" on November 16, 2011. (Chest Pain, Nov. 16, 2011, Doc. No. 138; Progress Notes, Nov. 16 2011, Doc. No. 138).

11, 2011, Nov. 14, 2011, Doc. Nos. 138, 147-24, 147-25, 157-31, 157-32; Physician's Orders, Nov. 14, 2011, Doc. No. 138). The medical records also indicate that Plaintiff was seen by medical staff in response to complaints of "wrist, ankle, and knee pain" on December 19, 2011, and December 20, 2011. (Medical Records, Dec. 19, 2011, Dec. 20, 2011, Doc. Nos. 138, 147-26, 158-2). Plaintiff was prescribed Motrin for his pain by a doctor on December 20, 2011, and was prescribed Motrin and Amoxicillin on December 27, 2011. (Physician's Orders, Dec. 20, 2011, Dec. 27, 2011, Doc. No. 138). Plaintiff's records also indicate that, in response to a sick call request placed on December 28, 2011, Plaintiff was seen by medical staff on December 29, 2011. (Sick Call Request, Dec. 28, 2011, Doc. No. 138). Plaintiff was further seen in Chronic Care on January 9, 2012, and again prescribed Motrin. (Progress Notes, Jan. 9, 2012, Doc. No. 138; Physician's Orders Jan. 9, 2012, Doc. No. 138).

Plaintiff was discharged from prison on January 18, 2012. (Pl.'s Dep. 130:4–6, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3; Municipal Defs.' Statement of Facts ¶ 11, Doc. No. 143; Discharge Summary, Jan. 18, 2012, Doc. No. 138). Following Plaintiff's release from prison, Plaintiff sought treatment from March 2012[18] through June 2012[19] at Pain Management. (Pl.'s Dep. 150:5–10, Feb. 21, 2013, Doc. Nos. 149-3, 155-3). Plaintiff also sought treatment at Pain Management from August 2012 through December 2012, although he went less frequently

---

[18] Plaintiff asserts that he did not seek treatment in February 2012 because he was on house arrest in February 2012 and "had to get a schedule to leave." (Pl.'s Dep. 149:21–150:4, Feb. 21, 2013, Doc. Nos. 149-3, 155-3).

[19] Plaintiff was reincarcerated for approximately one month beginning June 26, 2012 for a violation of probation. (Pl.'s Dep. 41:13–17, 150:11–12, Feb. 21, 2013, Doc. Nos. 133-5, 149-3, 155-3). As Plaintiff's amended complaint does not allege any unconstitutional denial of medical care during this period of incarceration, this Court does not consider evidence pertaining to medical care received during this period of incarceration.

in the period from September 2012 through November 2012, and again in February 2013. (Id. at 150:16–25, 152:3–9). In March 2012, Dr. Wisdo of Pain Management again noted in a progress report that Plaintiff's injuries were "the direct result" of the incident on May 4, 2010. (Pain Management Records 10, Doc. Nos. 147-17, 148-7, 157-23, 158-15).[20]

Plaintiff filed his complaint on May 3, 2012. (See Doc. No. 1). Plaintiff then filed an amended complaint, naming multiple defendants, including individual employees of Defendant Corizon and Defendant City of Philadelphia, on May 23, 2012. (See Doc. No. 14). Defendant Nurse Forbes was dismissed from the matter by stipulation of the parties. (See Doc. No. 72). On October 25, 2012, all claims against Defendants Hallworth, Pinney, and Wade were dismissed except for Plaintiff's Monell claim against Corizon (Claim 3), which remained against them in their official capacities. (See Order, Oct. 25, 2012, Doc. No. 77). Also on October 25, 2012, all claims against Defendant Dr. Richard Mandel were dismissed. (See Order, Oct. 25, 2012, Doc. No. 78). On April 25, 2013, all claims against Defendant Correctional Officer Perry were dismissed without prejudice for failure to effect service, pursuant to Fed. R. Civ. P. 4(m). (See Order, Apr. 25, 2013, Doc. No. 130). On June 7, 2013, all claims against Defendant Hilty were

---

[20] This Court notes the submission of a report by Marylouis Friedberger, PA-C, indicating her opinion that "to a degree of medical certainty, . . . a lay person would have known that [Plaintiff's] fracture of the proximal fibula and spiral fracture of the distal tibia . . . were serious medical needs that required prompt and adequate medical attention," (Friedberger Report ¶ 9, Doc. No. 133-17); however the capacity in which she offers this opinion is unclear, since, although she writes of what a lay person would know, Plaintiff listed her as an expert witness as a pain management consultant, (see Pl.'s Designation of Expert Witnesses ¶ 1, Doc. No. 156-2). This Court notes that Ms. Friedberger is a Physician Assistant who also holds an associate degree in social work; she is not a doctor with either a specialty in orthopedics or general practice. (See Friedberger CV, Doc. No. 133-16). Ms. Friedberger's subsequent statement that the medical care provided by Defendant Corizon and its employees, including Dr. Boggio, "constituted deliberate indifference to his serious medical needs" is disregarded as a legal determination that is properly made by this Court.

dismissed. (See Order, June 7, 2013, Doc. No. 132).

Therefore, only the following claims remain against one or more Defendants: (1) civil rights conspiracy (Claims 1[21] & 5); (2) Monell claims for denial of medical care (Claims 2 & 3); (3) failure to supervise (Claims 6, 7, 8 & 9); (4) breach of contract (Claim 10); (5) retaliation for filing of a grievance by being placed in segregation (Claim 11); (6) state-created danger (Claim 12); (7) assault and battery (Claims 13 & 14); (8) negligence (Claims 15, 17 & 18); (9) medical battery (Claim 16); (10) premises liability (Claim 19); (11) fraudulent and deceptive trade practices (Claims 20 & 21); (12) retaliation for filing of a grievance by being denied medical care (Claim 22); (13) denial of due process for failure to investigate grievances (Claim 23); and (14) intentional infliction of emotional distress (Claim 24).

## II. Legal Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988). A factual dispute is material if it could "affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if sufficient evidence exists that "a reasonable jury could return a verdict for the nonmoving party." Id. at 249. The moving party bears the initial burden of identifying evidence showing an absence

---

[21] Plaintiff's complaint simply entitles this claim "Violations of Constitutional Amendments, Civil Rights and Other Federal Laws," (Am. Compl. 49, Doc. No. 14). However, in his response to Defendant Hilty's prior motion to dismiss (Doc. No. 114), Plaintiff suggested that this claim should be interpreted as an allegation of civil rights conspiracy, (see Pl.'s Resp. 12–15, Doc. No. 123; Order, June 7, 2013, Doc. No. 132).

of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In considering a motion for summary judgment, this Court "view[s] the facts in the light most favorable to the nonmoving party and draw[s] all inferences in that party's favor." Bartos v. MHM Corr. Servs., Inc., 454 F. App'x 74, 76 (3d Cir. 2011) (quoting Stratechuk v. Bd. of Educ., 587 F.3d 597, 603 (3d Cir. 2009), cert. denied, 131 S. Ct. 72 (2010)) (not precedential). Nonetheless, a court should grant summary judgment where the nonmovant's evidence is "merely colorable." Anderson, 477 U.S. at 249–50. Similarly, "general averments and conclusory allegations" will not suffice. Bartos, 454 F. App'x at 76 (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888–89 (1990); Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992)). Courts considering cross-motions for summary judgment apply these same standards and burdens. Allah v. Ricci, No. 12-4095, -- F. App'x -- , 2013 WL 3816043, at *1 (3d Cir. July 24, 2013) (citing Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987)) (not precedential).

III.    Monell Claims for Denial of Medical Care (Claims 2 & 3)

42 U.S.C. section 1983 provides a federal cause of action for a plaintiff whose constitutional rights have been violated by a person acting under color of state law. Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 580–81 (3d Cir. 2003). Claims under Section 1983 are not limited to public actors, Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978), and "private prison doctors working under contract with the government" are deemed to "act 'under color of state law' for purposes of [section] 1983." Johnson v. Stempler, 373 Fed. App'x 151, 153 n.1 (3d Cir. 2010) (quoting West v. Atkins, 487 U.S. 42, 54–57 (1988)) (not precedential).

To successfully plead a Section 1983 claim for violation of the Eighth Amendment for

denial of medical treatment, a plaintiff must plead "unnecessary and wanton infliction of pain or deliberate indifference to the serious medical needs of prisoners"; mere "allegations of medical malpractice" are insufficient. Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (quoting White v. Napoleon, 897 F.2d 103, 108–09 (3d Cir. 1990)) (quotation marks omitted). "Mere disagreement as to the proper medical treatment is also insufficient." Id. (quoting Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro,  834 F.2d 326, 346 (3d Cir. 1987)) (quotation marks omitted). Prison medical authorities are "afford[ed] considerable latitude . . . in the diagnosis and treatment of the medical problems of inmate patients," and "negligence in the administration of medical treatment to prisoners is not itself actionable under the Constitution." Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979). When relying on Section 1983 to sue a private actor, liability cannot rest solely on the principle of respondeat superior; rather, a plaintiff must show individual liability based on specific actions or failures to act. Natale, 318 F.3d at 582. "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).

To assert "deliberate indifference," the plaintiff must demonstrate that "the official must actually know of and disregard an excessive risk to the health of the inmate." Stempler, 373 Fed. App'x at 153 n.1 (citing Farmer v. Brennan, 511 U.S. 825, 829 (1994)). Therefore, to defeat a motion for summary judgment, the plaintiff "must present enough evidence to support the inference that the defendants are knowingly and unreasonably disregarding an objectively intolerable risk of harm." Heggenmiller v. Edna Mahan Corr. Inst. for Women, 128 F. App'x 240, 246–47 (3d Cir. 2005) (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 132 (3d Cir.

2001)) (internal quotation marks omitted) (not precedential). Although courts "will generally not find deliberate indifference when some level of medical care has been offered to the inmate," Christy v. Robinson, 216 F. Supp. 2d 398, 413–15 (D.N.J. 2002) (citation omitted), the Third Circuit has explained that "deliberate indifference to serious medical needs" may include denial of "reasonable requests for medical treatment" by prison authorities when either "such denial exposes the inmate to undue suffering or the threat of tangible residual injury" or "knowledge of the need or medical care is accompanied by the . . . intentional refusal to provide that care." Id. (quoting Monmouth Cnty., 834 F.2d at 346) (quotation marks omitted). "Short of absolute denial, if necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out." Monmouth Cnty, 834 F.2d at 346 (internal quotation omitted). However, "misdiagnosis or preference for a certain type of treatment will not alone rise to the level of deliberate indifference." Christy, 216 F. Supp. 2d at 413 (citing United States ex rel. Walker v. Fayette Cnty., 599 F.2d 573, 575 (3d Cir. 1979); Estelle, 429 U.S. at 106); see also Brown v. Beard, 445 F. App'x 453, 455 (3d Cir. 2011) (quoting Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) ("Claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute deliberate indifference.") (not precedential).

In addition to "deliberate indifference on the part of the prison officials," the plaintiff must also plead that his medical need is "serious." Id. at 235–36 (quoting Monmouth Cnty., 834 F.2d at 346) (quotation marks omitted). A "serious" medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Stempler, 373 Fed. App'x at 153 n.1 (citing Monmouth Cnty., 834 F.2d at 347). Therefore, a prisoner's Eighth Amendment rights are

violated if "prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment." Unterberg v. Corr. Med. Sys., Inc., 799 F. Supp. 490, 495 (E.D. Pa. 1992) (citing West v. Keve, 571 F.2d 158, 162 (3d Cir. 1978)).

To hold an individual liable in his official capacity or extend liability to a municipal employer, the plaintiff must show that the defendant initiated or maintained, on behalf of the municipality, a policy or custom that caused the constitutional violation. Natale, 318 F.3d at 583–84. "Not all state action rises to the level of a custom or policy." Morton v. City of Phila., No. 09-4877, 2011 WL 536545, at *7 (E.D. Pa. Feb. 15, 2011). "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law," Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citing Andrews, 895 F.2d at 1480), and "may be established by proof of knowledge and acquiescence," Fletcher v. O'Donnell, 867 F.2d 791, 793–94 (3d Cir. 1989).

One in an official capacity and, therefore, the municipality, may be liable under Section 1983 in cases where a policymaker "made 'a deliberate choice to follow a course of action . . . from among various alternatives, . . . and the policy chosen 'reflects deliberate indifference to the constitutional rights" of citizens. Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989) (quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989)). However, "a single

incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." Groman v. Twp. of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995) (quoting Okla. City v. Tuttle, 471 U.S. 808, 823–24 (1985)). See also Carter v. Smith, No. 08-cv-279, 2011 WL 2313862, at *21 (E.D. Pa. June 13, 2011) (quoting Banks v. Gallagher, 686 F. Supp. 2d 499, 511 (M.D. Pa. 2009)) ("Isolated violations are not the persistent, often repeated, constant violations that constitute a custom or policy."). In determining whether a defendant is a "policymaker," courts look to state law to determine whether the official "has final, unreviewable discretion to make a decision or take an action." Kelly v. Borough of Carlisle, 622 F.3d 248, 246 (3d Cir. 2010) (citing Andrews, 895 F.2d at 1581).

This Court notes that Plaintiff raises these claims specifically as Monell claims for violations of the Eighth Amendment due to denial of medical care against Defendant City of Philadelphia and Defendant Corizon in his amended complaint, (see Am. Compl. ¶¶ 207–217, Doc. No. 14); therefore, we do not consider any arguments Plaintiff now raises in his responses for individual liability on grounds of deliberately indifferent denial of medical care, (see Pl.'s Resp. 31–51, Doc. No. 145), and consider only individuals' responsibility in their official capacities as policymakers.

A.      Defendant Corizon (Claim 3)

In alleging a Monell claim against Defendant Corizon, Plaintiff specifically names Defendants Hallworth, Pinney, and Wade as policymakers in his amended complaint, (Am. Compl. ¶¶ 214–216, Doc. No. 14), and further states in his response to the Corizon Defendants'

instant motion that Defendants Haque and Dr. Kalu are also policymakers of Defendant Corizon, (Pl.'s Resp. 14–15, 23, Doc. No. 145). Plaintiff also suggests in his response that Vice President Silva, Registered Nurse Deer, and Defendant Boggio may also be policymakers of Defendant Corizon. (Pl.'s Resp. 19, Doc. No. 145).[22] Despite these statements, however, Defendant does not produce evidence that Defendant Haque, Vice President Silva, Registered Nurse Deer, or Defendant Boggio have "final, unreviewable discretion to make a decision or take an action" concerning Plaintiff's medical care. Kelly, 622 F.3d at 246 (citing Andrews, 895 F.2d at 1581). Defendants Haque and Boggio have indicated that Dr. Kalu was their supervisor and had to approve referrals to an orthopedist. (Haque Dep. 23:21–28:14, 61:11–15, Apr. 11, 2013, Doc. Nos. 146-12, 148-13, 155-8; Boggio Dep. 60:20–24, 94:4–15, 108:4–6, Feb. 22, 2013, Doc. Nos. 133-11, Doc. No. 148-10, 155-5). Registered Nurse Deer stated only that she had the authority to terminate employees, in coordination with Dr. Kalu, and "oversee[s]" grievances "if there is an issue," discussing only that she would "substantiate" some grievances, (Deer Dep. 10:7–11:5, Apr. 11, 2013, Doc. Nos. 148-11, 155-6); there is no evidence that she could direct specific medical care or prescribe medical care in response to grievances.

Defendants Hallworth, Pinney, and Wade all indicate that, although they may have been responsible for other corporate policies at Defendant Corizon, they all occupied administrative positions with "no medical or mental health care responsibilities" and "made no decisions regarding clinical issues or the applications of policies" to Plaintiff. (Hallworth Certification, June 21, 2012, Doc. No. 133-6; Pinney Certification, June 20, 2012, Doc. No. 133-8; Wade

---

[22] This Court notes that Dr. Kalu, Vice President Silva, and Registered Nurse Deer were not individually named as defendants or mentioned in Plaintiff's amended complaint.

Certification, June 20, 2012, Doc. No. 133-10; Pinney Dep. 10:11–15, Apr. 11, 2013, Doc. Nos. 148-14, 155-11; Hallworth Dep. 15:19–17:4, Mar. 27, 2013, Doc. Nos. 133-7, 148-12, 155-7). The record clearly indicates that Plaintiff received medical care, and Defendants Hallworth, Pinney, and Wade, having no clinical responsibilities and no knowledge that Plaintiff was allegedly being denied adequate medical care, were entitled to depend on Plaintiff's doctors' assessments regarding treatment. See Beard, 445 F. App'x at 455 n.4 (citing Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004); Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993)) ("Non-medical officials are entitled to depend on medical professionals' judgment.") Not only is there no indication that Defendants Hallworth, Pinney, and Wade knew Plaintiff was allegedly being denied adequate medical care, there is no indication in the record that Defendants Hallworth, Pinney, and Wade even knew that Plaintiff was an inmate in PPS, and Plaintiff himself admits that he has never seen any of these individuals, (Pl.'s Dep. 108:1–6, Feb. 21, 2013, Doc. Nos. 133-5, 149-3, 155-3).

Therefore, at most, Plaintiff has identified one possible policymaker for medical care at Defendant Corizon, Dr. Kalu. However, Plaintiff has not provided evidence of any particular policy, custom, or practice that resulted in the alleged violation of his constitutional right to adequate medical care. In his response to the Corizon Defendants' instant motion, Plaintiff broadly argues the following bases for Defendant Corizon's liability: (1) a policy of "deliberately indifferently treating PPS inmates with orthopedic injuries" because, despite the holdings in other cases involving Defendant Corizon, such as Morton v. City of Phila., No. 09-4877, 2011 WL 536545 (E.D. Pa. Feb. 15, 2011), it did not have an orthopedic doctor on staff and had "problems with faxing patient referrals to outside doctors" at the time of Plaintiff's injury; (2) a failure "to

establish a policy to address the immediate medical needs of inmates with serious medical conditions that creates a risk that is sufficiently obvious to constitute deliberate indifference to those inmates' medical needs" following the decision in <u>Morton</u>; and (3) a policy of delaying treatment for non-medical reasons, although Plaintiff does not explicitly state what such non-medical reasons were. (Pl.'s Resp. 16–17, 21–24, Doc. No. 145).[23] We address Plaintiff's arguments in turn.

First, the fact that Defendant Corizon did not have an orthopedic doctor on staff is not dispositive, since the record clearly indicates that Defendant Corizon had procedures in place to obtain orthopedic referrals and, in fact, Plaintiff received treatment from an orthopedist. The record indicates that orthopedists come to the prison approximately every two weeks and, in cases of emergency, x-rays are taken and the inmate is sent to the emergency room, as occurred with Plaintiff. Following these procedures, this Court notes that Plaintiff received immediate medical attention and not only a consultation with an orthopedist, but surgery within three weeks of his injury. These facts do not demonstrate deliberate indifference. Plaintiff's argument regarding the alleged "problems with faxing patient referrals" also fails. Again, this Court notes the timely manner in which Plaintiff received a consultation with an orthopedist and his surgery. Although two faxes appear to have been delayed or not sent, these referrals were redone and Plaintiff was still seen for follow-up care with an orthopedist with no more than a two week

---

[23] Plaintiff also argues that Dr. Kalu had knowledge that inmates were being injured getting off or into bunk beds, but "did nothing to address the underlying ca[u]se of those injuries." (Pl.'s Resp. 24, Doc. No. 145). It is not clear exactly how this argument fits into Plaintiff's theory of liability. Regardless, there is no evidence in the record that Dr. Kalu had any particular responsibility as to the provision of different types of bunk beds or ladders, so it is unclear what, if anything, Dr. Kalu could have done to "address the underlying ca[u[se of those injuries," (Pl.'s Resp. 24, Doc. No. 145).

delay. Even considering the four additional faxes that Defendant Boggio claimed may have been misplaced in the last four years, Plaintiff does not establish a policy or custom of mishandling faxes that constitute deliberate indifference: at most, this could be negligence, which is insufficient to prevail on a Section 1983 claim. See, e.g., Beard, 445 F. App'x at 455 ("Even assuming the truth of Brown's allegations, defendants at worst treated [plaintiff] negligently.").

Second, Plaintiff has not demonstrated a failure to establish a policy to address the immediate medical needs of inmates that is sufficiently obvious to constitute deliberate indifference. Again, the record clearly indicates that Defendant Corizon had procedures in place to obtain orthopedic referrals and, in cases of emergency, have x-rays taken and the inmate sent to the emergency room. Plaintiff himself benefitted from all of these procedures, having (1) received immediate medical attention, (2) had x-rays taken, (3) been transported to the emergency room, and (3) received treatment and surgery from an orthopedist. The record further indicates that Plaintiff was repeatedly seen by medical staff, received follow-up consultations with orthopedists pursuant to Defendant Corizon's procedures, and was, at various points, provided with bunk bed accommodation slips, pain medication, crutches, a cane, and a knee brace. These facts do not indicate deliberate indifference.[24]

Third, Plaintiff broadly alleges that Defendant Corizon had a policy of delaying treatment for non-medical reasons, without specifically indicating what such reasons might be. To the extent that Plaintiff seeks to argue that Defendant Corizon delayed treatment due to cost

_____

[24] Although Plaintiff cites to Morton, 2011 WL 536545, this case is easily distinguishable from Plaintiff in that case, who waited five months for an orthopedic consult and surgery for his injury. As noted above, Plaintiff here received immediate attention and both an orthopedic consult and surgery within three weeks of his injury.

considerations, there is no indication that referrals for orthopedic care resulted in additional cost to Defendant Corizon. In fact, Dr. Kalu indicated that Defendant Corizon "doesn't pay for outpatient clinic visits"; rather, Defendant City of Philadelphia does so. (Kalu Dep. 85:14–20, Apr. 9, 2013, Doc. Nos. 133-15, 146-11, 154, 155-9). Even if Defendant Corizon did incur costs for such treatment, mere consideration of cost in providing medical treatment to inmates is insufficient to establish deliberate indifference. See, e.g., Beard, 445 F. App'x at 456 (citing Reynolds v. Wagner, 128 F.3d 166, 175 (3d Cir. 1997)) ("The mere assertion that defendants considered cost in treating [plaintiff's] hernia does not suffice to state a claim for deliberate indifference, as prisoners do not have a constitutional right to limitless medical care."). Therefore, this argument also fails.

B.      Defendant City of Philadelphia (Claim 2)

Plaintiff's Monell claim against Defendant City of Philadelphia is based solely on an alleged policy, custom, or practice of denying adequate medical care by contracting with Defendant Corizon to provide medical care to inmates. Because this Court finds that Plaintiff has not demonstrated a policy resulting in the denial of adequate medical care on the part of Defendant Corizon, Plaintiff's claim against Defendant City of Philadelphia for denial of medical care also fails.[25]

For all these reasons, Plaintiff has failed to establish a Monell claim for denial of medical care against either the Corizon Defendants or the Municipal Defendants, and summary judgment is granted in favor of the Corizon Defendants and Municipal Defendants on these claims.

---

[25] This Court notes that Plaintiff also does not establish that all of the named Defendants who are employees of the City were policymakers.

IV.     Failure to Supervise (Claims 6, 7, 8 & 9)

To prevail on a claim of failure to supervise, Plaintiff must demonstrate that "(1) existing policy or practice creates an unreasonable risk of Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." Heggenmiller, 128 F. App'x at 246–47 (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)) (not precedential). Although unreasonable risk is "normally shown by evidence that such harm has in fact occurred on numerous occasions," the Third Circuit has indicated that in situations "in which the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support" a finding of failure to supervise. Id. at 247 (citing Sample, 885 F.2d at 1118). However, such situations are "limited to a narrow range of circumstances where a violation of federal rights is a highly predictable consequence" of a failure to adequately train or supervise. Id. at 247 (quoting Bd. of Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 409 (1997)). A plaintiff must show a "close causal relationship" between the alleged conduct and plaintiff's injuries. Id. (citing Sample, 885 F.2d at 1117). Imposition of liability for failure to supervise requires a showing of culpability: "A showing of simple or even heightened negligence will not suffice." Id. (quoting Brown, 520 U.S. at 407).

Plaintiff alleges that Defendant City of Philadelphia and Defendant Herdman individually failed to supervise Defendant Corizon (Claim 6) and PPS employees and contractors regarding medical care (Claims 7 & 8) and that Defendant Corizon failed to supervise Defendants Boggio and Haque and its other medical staff (Claim 9), resulting in the denial of adequate medical care in violation of his Eighth Amendment rights. (Am. Compl. ¶¶ 229–253, Doc. No. 14).

Plaintiff does not clearly indicate in what way Plaintiff's injuries resulted from a policy or practice of a failure to supervise or train. Plaintiff's injuries were caused by his falling while lowering himself from the top bunk bed. To the extent that Plaintiff attempts to argue that Defendant City of Philadelphia is liable because they did not have ladders for all the bunk beds, such argument fails, since that is, at most, negligence, which does not demonstrate the requisite culpability for liability to attach. See Diaz v. Arnold, No. 12-6754, 2013 WL 334796, at *1 (E.D. Pa. Jan. 28, 2013) (citing Davidson v. Cannon, 474 U.S. 344, 347 (1986); Daniels v. Williams, 474 U.S. 327, 328 (1986)) (noting that "negligent conduct which causes unintended injury to an inmate does not amount to a constitutional violation" and dismissing an inmate's Section 1983 claim for injuries incurred when he fell from a top bunk bed because the bed did not have a ladder). This Court notes that Defendant Corizon cannot be held liable under this argument, since there is no indication that Defendant Corizon had any authority over equipment such as bunk beds.

To the extent Plaintiff seeks to argue that his injuries were worsened by a failure to supervise on the part of either Defendant City of Philadelphia or Defendant Corizon, there is no evidence in the record that his injuries failed to properly heal due to the actions of any employees of either Defendant City of Philadelphia or Defendant Corizon. Plaintiff admits receiving immediate attention for his injuries, as well as orthopedic consultations, surgery, and follow-ups. Further, the record indicates that Plaintiff received medical attention from Defendant Corizon's staff, equipment such as crutches, a cane, and a knee brace, and, upon complaints of pain, pain medication. Plaintiff simply has not established the requisite "close causal relationship" between Defendant Corizon's conduct and Plaintiff's injuries.

To the extent Plaintiff seeks to argue that Defendant Corizon is liable for failure to supervise for permitting Defendants Haque and Boggio to examine Plaintiff without having orthopedic specialties, this Court notes that the doctors referred Plaintiff for x-rays and emergency care the night of his injury and also referred him to an orthopedic specialist for consultation after the x-rays indicated a fracture. Even taking Plaintiff's allegation that Defendant Boggio grabbed and twisted Plaintiff's leg and ankle, there is no evidence that Defendant Corizon or its policymakers, see supra Part III.A., were aware that there was an unreasonable risk of such treatment or exhibited indifference to that risk.[26] Plaintiff has not demonstrated the requisite culpability for liability to attach.

Because Plaintiff has not established any denial of adequate medical care in violation of the Eighth Amendment on the part of Defendant Corizon or its staff with respect to his injuries, Plaintiff also cannot establish a failure to supervise claim against Defendant City of Philadelphia and Defendant Herdman for failure to supervise Defendant Corizon or its staff.

Because Plaintiff fails to establish all the elements for his failure to supervise claims against either Defendant Corizon, Defendant City of Philadelphia, or Defendant Herdman, summary judgment is granted in favor of these Defendants on these claims.

V.    Retaliation for Filing of a Grievance by Placement in Segregation (Claim 11)

A prisoner-plaintiff claiming retaliation must demonstrate "(1) constitutionally protected

---

[26] Plaintiff has noted that Defendant Boggio had received counseling regarding his practices and was eventually terminated. However, these incidents were not related to allegations of twisting a limb when examining for orthopedic injury or fractures; rather, many related to his note taking, phone usage, and failure to prescribe medications. (See generally Kalu Dep. 110:14–116:22, 119:19–121:2, 122:8–7, 128:17–137:12, Apr. 9, 2013, Doc. Nos. 133-15, 146-11, 155-9).

conduct, (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him." Thompson v. Pitkins, 514 F. App'x 88, 90 (3d Cir. 2013) (quoting Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003)) (not precedential). The plaintiff must show that "the constitutionally protected conduct was a substantial motivating factor in Defendants' conduct." Verbanik v. Harlow, 512 F. App'x 120, 122–23 (3d Cir. 2013) (citing Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)) (not precedential). "If a plaintiff can establish a prima facie case of retaliation the burden shifts to the defendant to demonstrate that even without the impetus to retaliate he would have taken the action complained of." Id. (quoting Hartman v. Moore, 547 U.S. 250, 260 (2006)) (internal quotation marks omitted).

This Court notes that Plaintiff has not provided any evidence as to why being placed in segregation would be "sufficient to deter a person of ordinary firmness from exercising his constitutional rights." Although he names deprivations in the infirmary, such as being unable to go to the store, visit with family, and wear sneakers, and notes that it was "like the hole," Plaintiff makes no specific comparisons or allegations as to deprivations associated with being placed in segregation. (Pl.'s Dep. 90:8–13, Feb. 21, 2013, Doc. Nos. 133-5, 139-3, 149-3, 155-3). However, even assuming placement in segregation was "an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights," Plaintiff's claim fails because he has not demonstrated that his desire to file a grievance was a substantial motivating factor in Defendant Cheeseborough's conduct.

This Court notes at the outset that the record indicates that Plaintiff was charged with multiple infractions by Officer Bullock: Defendant Cheeseborough is listed only as the supervisor. (Misconduct Summary 3, Doc. No. 139-5). Plaintiff does not dispute that he was charged with these infractions. Further, although Plaintiff asserts that Defendant Cheeseborough's charge was "frivolous and unfounded," (Am. Compl. ¶ 263, Doc. No. 14), the record indicates that Plaintiff was found guilty of the major infraction of "interfering with count," although he was found not guilty of the other charges. (Misconduct Summary 2, Doc. No. 139-5). Therefore, even if Plaintiff had not filed a grievance, these charges were validly applied, as Plaintiff was found guilty of at least one infraction. Although Plaintiff asserts that a lieutenant suggested that, if he decided not to file a grievance, he could go back to bed rather than be sent to segregation, this unsupported assertion is not enough to create a question of material fact.

Therefore, because Plaintiff has failed to demonstrate all of the elements for a retaliation claim against Defendant Cheeseborough, summary judgment is granted for Defendant Cheeseborough on this claim.

VI.    State-Created Danger (Claim 12)

A state actor can be held liable under the "state-created danger" theory under Section 1983 "when the harm incurred is a direct result of state action." Ye v. United States, 484 F.3d 634, 637 (3d Cir. 2007). This theory "recognizes a substantive due process violation may occur when state authority is affirmatively employed in a manner that injures a citizen or renders him more vulnerable to injury from another source than he or she would have been in the absence of state intervention." Navolio v. Lawrence Cnty., 406 F. App'x 619, 624 (3d Cir. 2011) (quoting

Bright v. Westmoreland Cnty., 443 F.3d 276, 281 (3d Cir. 2006)) (not precedential). To prevail

on a state-created danger claim, a plaintiff must show:

> (1) the harm ultimately caused was foreseeable and fairly direct;
> (2) a state actor acted with a degree of culpability that shocks the
> conscience;
> (3) a relationship between the state and the plaintiff existed such
> that the plaintiff was a foreseeable victim of the defendant's acts,
> or a member of a discrete class of persons subjected to the potential
> harm brought about by the state's actions, as opposed to a member
> of the public in general; and
> (4) a state actor affirmatively used his or her authority in a way that
> created a danger to the citizen or that rendered the citizen more
> vulnerable to danger than had the state not acted at all.

Ye, 484 F.3d at 637–38 (quoting Bright, 443 F.3d at 281). A plaintiff must show a "direct causal

relationship between the affirmative act of the state and [his] harm." Id. at 643 (quoting Kaucher

v. Cnty. of Bucks, 455 F.3d 418, 432 (3d Cir. 2006)). "In a case where state actors have the time

to make unhurried judgments, the level of culpability required to shock the conscience is

deliberate indifference." Navolio, 406 F. App'x at 624 (citing Sanford v. Stiles, 456 F.3d 298,

309 (3d Cir. 2006)).

In his amended complaint, Plaintiff alleges that Defendant City of Philadelphia created a

state-created danger in contracting with Defendant Corizon to provide medical care to inmates

because Defendant City of Philadelphia knew or should have known that Defendant Corizon was

not qualified to provide or would not provide adequate medical care. (Am. Compl. ¶¶ 268–73,

Doc. No. 14). There is no evidence in the record that Defendant City of Philadelphia did not have

the time to make an "unhurried judgment," and Plaintiff does not argue to the contrary.

Therefore, the level of culpability required for liability to attach is deliberate indifference. See

Navolio, 406 F. App'x at 624 (citing Sanford v. Stiles, 456 F.3d 298, 309 (3d Cir. 2006)). As

noted <u>supra</u> Part III, Plaintiff has failed to establish deliberate indifference on the part of Defendant Corizon and, therefore, has also failed to establish any constitutional violation on the part of Defendant City of Philadelphia in contracting with Defendant Corizon for medical services for PPS's inmates.

Because Plaintiff cannot establish that Defendant City of Philadelphia "acted with a degree of culpability that shocks the conscience," Plaintiff's state-related danger claim fails, and summary judgment is granted in favor of Defendant City of Philadelphia on this claim.

VII.    Retaliation for Filing of a Grievance by Denial of Medical Care (Claim 22)

The standard noted <u>supra</u> Part V also applies to Plaintiff's claim of retaliation against Defendant Corizon. In this claim, Plaintiff argues that Defendant Corizon retaliated against Plaintiff for filing grievances and a Notice of Intent to Sue by denying him medical care. (Am. Compl. ¶¶ 327–31, Doc. No. 14). However, as noted <u>supra</u> Part III.A., Plaintiff has failed to establish that he was denied medical care; in fact, the record indicates that Plaintiff received not only treatment from Defendant Corizon's medical staff, but also consultations and surgery from orthopedic specialists. Further, Plaintiff was provided with pain medication and equipment such as crutches, a cane, and a knee brace.

Since Plaintiff cannot establish a denial of medical care, Plaintiff cannot demonstrate any adverse action by prison officials. Therefore, Plaintiff's claim fails, and summary judgment is granted in favor of Defendant Corizon on this claim.

VIII.    Denial of Due Process for Failure to Investigate Grievances (Claim 23)

Plaintiff asserts that Defendant City of Philadelphia denied him his due process rights, in violation of Section 1983, by "fail[ing] to properly investigate and process [his] grievances."

37

(Am. Compl. ¶ 335, Doc. No. 14). Plaintiff alleges in his amended complaint that "his grievances were thrown in the trash or not processed by Defendant, Giorla [the Commissioner of PPS] and other decision and policy-makers at PPS pursuant to a custom, policy and practice of unlawfully covering up violent acts of misconduct by correctional officers," including Defendant Cheeseborough. (Id. at ¶¶ 176–77). However, Plaintiff has failed to provide any evidence in support of these allegations.

"Prisoners do not have a constitutional right to prison grievance procedures." Heleva v. Kramer, 214 F. App'x 244, 247 (2007) (3d Cir. 2007) (citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001)) (not precedential). "[W]hen the claim underlying the administrative grievance process involves a constitutional right, the prisoner's right to petition the government for redress is the right to access the courts, which is not compromised by the prison's refusal to entertain his grievance." Winn v. Dep't of Corr., 340 F. App'x 757, 759 (3d Cir. 2009) (quoting Flick v. Alba, 932, F.2d 728, 729 (8th Cir. 1991)) (not precedential). The Third Circuit has indicated that a prison official's refusal to entertain a grievance "does not in itself give rise to a constitutional claim"; rather, the refusal, if proven, would permit the prisoner to file a Section 1983 claim in district court, as Plaintiff has done here, and "overcome an affirmative defense of exhaustion." Id. (citing Flick, 932 F.2d at 729; 42 U.S.C. § 1997e(a); Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000)); see also Stringer v. Bureau of Prisons, 145 F. App'x 751, 753 (3d Cir. 2005) (citation omitted) (noting that appellees' "alleged failure to process or respond to the prisoner's grievances did not violate his rights to due process and is not actionable") (not precedential); Hughes v. Smith, 237 F. App'x 756, 758 (3d Cir. 2007) (same) (not precedential).

To the extent Plaintiff seeks to argue that Defendant City of Philadelphia's failure to investigate and process Plaintiff's grievances would bar Plaintiff from filing a Section 1983 claim in federal court, such argument fails: As the Third Circuit has stated, "[U]nder Section 1997e(a) the prisoner need only exhaust such administrative remedies 'as are available.'" Camp, 219 F.3d at 281; see also Jackson v. Gordon, 145 F. App'x 774, 777 (3d Cir. 2005) (noting that, if defendants had interfered with plaintiff's ability to file administrative grievances, plaintiff "may still have satisfied the exhaustion requirement, provided that he took advantage of all administrative remedies available to him") (internal citations omitted) (not precedential). Furthermore, this Court notes that Plaintiff has, in fact, filed multiple Section 1983 claims in federal court.

Because Plaintiff cannot establish denial of a constitutional right, this claim under Section 1983 fails. Summary judgment is granted in favor of Defendant City of Philadelphia on this claim.

IX.    Civil Rights Conspiracy (Claims 1 & 5)

To successfully plead a section 1983 conspiracy claim, plaintiff "must prove that persons acting under color of state law conspired to deprive him of a federal protected right." Ashton v. City of Uniontown, 459 F. App'x 185, 190 (3d Cir. 2012) (citing Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 254 (3d Cir. 1999), superseded by statute on other grounds as stated in P.P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009)) (not precedential). Plaintiff must plead sufficient facts to infer an agreement to act or concerted activity by the defendants alleged to have engaged in the conspiracy; merely asserting that the defendants "act[ed] in concert and conspiracy" is insufficient. See Ashton, 459 F. App'x at 191 (finding that

complaint was "devoid of any factual allegation showing an agreement or concerted activity" when it asserted only that "[t]he actions of all the Defendants, acting in concert and conspiracy, . . . amount to an abuse of official power that shocks the conscience" and, therefore, conspiracy claim failed). Similarly, "[c]ivil rights conspiracy claims that are based only on suspicion and speculation instead of fact do not state a claim." Jackson v. Gordon, 145 F. App'x 774, 778 (3d Cir. 2005) (citing Young v. Kann, 926 F.2d 1396, 1405 (3d Cir.1991)) (not precedential). Plaintiff must show that the state actor defendants "somehow reached an understanding to deny [him] his rights under [Section] 1983." Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970)).

A.    Claim 1

Here, Plaintiff claims only that "[a]ll Defendants, in unlawful agreement and concert with each other, pursuant to an unconstitutional custom, policy and practice" deprived Plaintiff of his constitutional rights. (Am. Compl. ¶ 204, Doc. No. 14). In addition to reiterating his Monell claims for denial of medical care (Claims 2 & 3) and failure to supervise claims (Claims 6, 7, 8 & 9), which this Court has already determined fail, (see supra Parts III & IV), Plaintiff appears to allege that (1) Defendant Giorla, having "personally been on notice of acts of deliberate indifference by PPS employees and contractors for many years," conspired with Defendant Herdman, PPS Wardens, Deputy Wardens, Correctional Officers and employees, including Defendant Cheeseborough, and Defendant Corizon's employees, including Defendant Boggio, to deprive Plaintiff of his constitutional rights by failing to supervise these individuals and entities; and (2) Defendant City of Philadelphia, Defendant Giorla, and Defendant Herdman, having "personally been on notice of acts of deliberate indifference by PPS Correctional Officers,

employees, and [Defendant Corizon] and [its] employees and [c]ontrators for many years," conspired to deprive Plaintiff of his constitutional rights by failing to supervise the PPS Correctional Officers, employees, and Defendant Corizon and its employees and contractors. (Am. Compl. ¶¶ 204–06, Doc. No. 14).

This Court first notes that Plaintiff has not provided any evidence indicating agreement or even concerted action; rather, he simply asserts that all Defendants named in the two, somewhat overlapping conspiracies acted "in unlawful agreement and concert with each other" and intentionally acted or failed to act in a way that violated his constitutional rights.

Even if this was sufficient to plead a civil rights conspiracy, Plaintiff's claim fails because, as explained supra Parts III–VIII, Plaintiff has failed to establish any deprivation of a federal civil right in violation of Section 1983. "[S]ince we have concluded that the federal civil rights claim[] which [is] the object of the conspiracy must be dismissed, the alleged conspiracy to violate federal civil rights must also be dismissed because no federally protected right exists that is the object of the conspiracy" and "one element of a conspiracy cause of action has not been satisfied." Ashton, 459 F. App'x at 191.

B.      Claim 5

In this claim, Plaintiff alleges that Defendants Cheeseborough[27] and Officer Perry

---

[27] Plaintiff's amended complaint also lists "Sgt. 'John Doe'" and "John Doe A Qualified Health Care Professional" as members of this conspiracy; however, these individuals have not been identified by name. In the heading of this claim, Plaintiff refers to "Correctional Office[r] []John Doe," which is very similar to the individual that has since been named as Defendant Joyner. Plaintiff does not specifically identify the events underlying his conspiracy claim; however, since Plaintiff does not allege any incident involving both Defendant Cheeseborough and Defendant Joyner, this Court interprets "Correctional Officer John Doe" to be another, unidentified individual, rather than Defendant Joyner.

conspired with other officers while they were on duty together to violate Plaintiff's constitutional rights. (Am. Compl. ¶¶ 224–27, Doc. No. 14). Plaintiff does not specify the exact constitutional violation, nor does he expressly identify an incident from which this Court could identify the alleged constitutional violation. Since Plaintiff only details one incident involving Defendant Cheeseborough, Officer Perry, and the other John Does listed in the heading, this Court interprets this allegation to be one of conspiracy to violate Plaintiff's constitutional rights by threatening retaliation and retaliating against Plaintiff for filing a grievance.[28] (See Am. Compl. ¶¶ 164–172, Doc. No. 14). Because Plaintiff has provided no evidence of agreement or even concerted action amongst these individuals and has failed to establish any deprivation of a federal civil right in violation of Section 1983, see Ashton, 459 F. App'x at 191, Plaintiff's claim of a civil rights conspiracy fails.

For all these reasons, Plaintiff has failed to establish any civil rights conspiracy claim, and summary judgment is entered in favor of the Corizon Defendants and the Municipal Defendants on these claims.

Therefore, it is hereby ORDERED that the Corizon Defendants' motion for summary judgment and the Municipal Defendants' motion for summary judgment are GRANTED as to all federal claims (Claims 1, 2, 3, 5, 6, 7, 8, 9, 11, 12, 22, and 23). As Plaintiff's federal claims have been dismissed and only state law claims remain, this Court declines to exercise supplemental jurisdiction over the remaining claims (Claims 10, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 24). These claims are DISMISSED without prejudice, and Plaintiff may pursue these claims in state

---

[28] Plaintiff's amended complaint does not assert any other constitutional violations by Defendant Cheeseborough, although it does include a state law claim for assault and battery, (see Am. Compl. ¶¶ 275–279, Doc. No. 14).

court, if desired. The Clerk of Court is directed to close this matter for statistical purposes. An

appropriate judgment order follows.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.